Filed 9/5/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re STEPHEN JOSEPH BENNETT on Habeas Corpus. | G055371 <br><br> (Super. Ct. No. 06ZF0138) <br><br> O P I N I O N |

Original proceedings; petition for a writ of habeas corpus. Richard F. Toohey, Judge. Petition granted; remanded with directions.

Elizabeth Richardson-Royer for Petitioner.

Xavier Becerra, Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Jennifer B. Truong, Deputy Attorneys General, for Respondent.

\* \* \*

Petitioner Stephen Bennett is currently serving an indeterminate sentence of life without the possibility of parole following his conviction for first degree special circumstance murder while aiding and abetting a robbery. (Pen. Code, § 190.2, subd. (a)(17)(A); all undesignated statutory references are to the Penal Code.) On direct appeal in 2010 we rejected his sufficiency of the evidence claim, and affirmed his conviction in a nonpublished opinion. (*People v. Stephen Joseph Bennett* (Nov. 15, 2010, G041372) [nonpub. opn.].)

In 2015, our Supreme Court decided *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*), and reaffirmed established law holding an aider and abettor of felony murder who lacks the intent to kill may be sentenced to a term of life without the possibility of parole only if he or she was a "'major participant'" in the crime, and acted with "reckless indifference to human life." (*Id.* at p. 798.) In doing so, the court more closely analyzed the issue both in light of statutory amendments made to section 190.2 by Proposition 115 (*Banks, supra,* 61 Cal.4th at p. 798),[1] and the United States Supreme Court's decisions in *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*) and *Enmund v. Florida* (1982) 458 U.S. 782 (*Enmund*). (*Banks, supra,* 61 Cal.4th at p. 801 ["To gain a deeper understanding of the governing test and offer further guidance, we examine more closely *Tison* and *Enmund*"].) In 2016, the Supreme Court revisited the issue in *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*). Where *Banks* focused its analysis more on the "'major participant'" requirement, *Clark* more closely examined the "reckless indifference to human life" factor. (*Clark, supra,* 63 Cal.4th at pp. 611, 614.)

Relying on *Banks*, Bennett filed a petition for writ of habeas corpus in the Supreme Court challenging the sufficiency of the evidence supporting the jury's robbery

---

[1]     Proposition 115 adopted a wide range of criminal justice reforms, including extending death penalty eligibility to "major participant[s]" in felony murders. (§ 190.2, subd. (d), added by initiative, Ballot Pamp., Primary Elec. (June 5, 1990) text of Prop. 115, § 10, p. 66; see *Raven v. Deukmejian* (1990) 52 Cal.3d 336, 342-345.)

special circumstance finding (*In re Stephen Bennett*, July 7, 2016, S235694). Citing *Banks*, the Supreme Court ordered the Secretary of the Department of Corrections and Rehabilitation to show cause in this court "why petitioner is not entitled to the relief requested."

We have reviewed the record in light of both *Banks* and *Clark,* and have re-examined aider and abettor culpability along the so-called *Enmund-Tison* spectrum. We find that even though Bennett's actions were essential to and instrumental in setting up the robbery, under *Enmund* there is not substantial evidence showing Bennett was a "'major participant'" in the robbery. Similarly, we find that under *Tison, Banks* and (particularly) *Clark*, there is insufficient evidence Bennett acted with the necessary "reckless indifference to human life." Accordingly, we grant the petition for writ of habeas corpus, vacate Bennett's life without possibility of parole sentence, and remand the matter to the trial court for resentencing.

I

FACTS[2]

On the night of Super Bowl Sunday, February 5, 2006, four drug addicts from Oceanside traveled to an apartment complex in Irvine, intending on meeting and robbing drug dealer Brian Gray. Two of those four men subsequently shot and killed Gray as he attempted to flee from the robbery. The four men involved were:

— Brandon Turner, one of the shooters, who later was tried and convicted for first degree special circumstance murder (*People v. Brandon Michael Turner* (Oct. 23, 2009, G041035) [nonpub. opn.]);

---

[2] The facts of the case were set forth in our nonpublished appellate opinion. We reiterate these facts where relevant to the petition, but also provide additional factual background from Bennett's exhibits where necessary.

— Deshawn Turner, Brandon's younger brother, who was not one of the shooters, and never left the car and whose involvement was so minimal he was not charged;

— Bernard Smith, who also was one of the shooters, and who later was tried and convicted for first degree special circumstance murder (*People v. Bernard Smith* (May 30, 2014, G047789) [nonpub. opn.]); and

— Petitioner Stephen Bennett, who, even though he was not one of the shooters, was tried and convicted as an aider and abettor to a special circumstance murder on the theory he was a major participant in the robbery who acted with reckless indifference to human life.

Bennett, Smith, and the Turner brothers were in Oceanside at the house of one of their acquaintances, Reuben Avery, a convicted felon and drug addict. With them was Avery's roommate, Rhonda Conner.

During the get-together, Brandon Turner complained that his parents had just kicked him and his brother Deshawn out of their home. He and Deshawn had nowhere to live and were down to their last two dollars. Brandon Turner concluded that he needed "a lick," which is slang for committing a robbery. At some point during the conversation, Smith complained that he needed drugs and asked Bennett where he could get some. The group discussed where they could get drugs, and Bennett said he could "make a killin[g]" selling the drugs. Brandon Turner voiced the idea they should "just take it," i.e., steal the drugs.

Bennett consequently called victim Gray, an Irvine resident, who was considered a reliable source of drugs. Bennett later explained to police Gray was the "one person you can call for drugs" because he "never ran out." Bennett asked Gray for two ounces of cocaine, which at the time sold for about $1,200. They agreed to meet that night. The plan was for Bennett to call Gray when Bennett got on the freeway. Bennett invited Avery to go with them, but Avery declined.

4

Gray lived in a large apartment complex. A carwash was across the street from the apartment complex, and it was there where Bennett usually met Gray when obtaining drugs. That night's plan was no different.

Bennett pulled into the carwash parking lot and called Gray to let him know he had arrived. Gray asked for a few minutes to get over to the parking lot, leaving his apartment around 11:00 p.m. A videotape from the carwash showed Bennett's car and Bennett urinating in the parking lot. While Bennett relieved himself, Smith and Brandon Turner walked across the street and into Gray's apartment complex.

There were several eyewitness accounts of the events that transpired. All the witnesses were residents who either heard gunshots or saw Smith and Brandon Turner chasing Gray and shooting at him. One witness, who was finishing a cigarette in his car, saw Gray run past first, followed by Brandon Turner, who was shooting at him, with Smith bringing up the rear.

Another witness heard seven or eight noises that sounded like firecrackers. When he looked outside his window, he saw three men run across his view. The third man slowed down, as if to catch his breath, and yelled "get him" insistently three times, before continuing his pursuit.

A third witness looked out her window when she heard gunshots. She saw Gray run by, followed by Smith and Brandon Turner. She "heard a 'very afraid' man scream for security." She looked out another window and heard a series of gunshots. She spotted two men running, and heard one of them saying "Did you pick him? Did you pick him?" with the other responding "The mother fucker is down." She then went outside and found Gray lying on the grass in front of the apartment building, bleeding from gunshot wounds. She called 911.

A fourth witness heard two gunshots and looked outside his window and saw Brandon Turner shooting at Gray, who continued to yell for security. Brandon

5

Turner changed the clip on his gun while he was running, "and, after Gray fell down, kept shooting at Gray from about 18 feet away." This witness asked his wife to call 911.

At 11:24 p.m., just three minutes after the fourth witness's call, police officers arrived at the apartment complex and found Gray unresponsive and without a pulse. Paramedics transported Gray to the hospital, but he died in transit from gunshot wounds. Gray had been shot several times. Three bullets were recovered from inside his body and two bullets had exited his body. One of the wounds consisted of three small pellets.

After gunning him down, Smith and Brandon Turner took the drugs from Gray and headed back across the street to the carwash.

Bennett had called Gray again after he finished urinating, and began to cross Michelson to look for Gray. When Bennett saw Smith and Brandon Turner heading back to the carwash, he turned back before he got to the middle of the street. Smith, Brandon Turner, Bennett, and Deshawn Turner headed back to Oceanside. Bennett later told police that during the drive back he learned Brandon Turner and Smith had shot Gray.

Near midnight, Bennett called Conner several times to ask for gas and money. While waiting for Conner to bring gas, Bennett also telephoned Avery, telling him "[we] got the dope," and Avery should have come along. Avery later testified Bennett was "frantic" because he was stuck on the side of the road and worried Gray "might be coming behind us." Bennett told Avery "they were not supposed to shoot [Gray], they were just supposed to get the dope." Bennett was arrested on February 16, 2006, en route from Vista to Tucson, Arizona.

When later interviewed by police, Bennett denied being involved in shooting Gray: "But I didn't shoot the man. Didn't set the man up. Didn't have no intention of that because he was too nice of a guy to me and that's real."

6

Police recorded a conversation between Bennett and Smith while they were sitting in a patrol car after their arrest. The transcript contains the following dialogue in which they discussed the robbery:

"[Smith]: These [police] talking about just another gun, I said what you talking about, I don't know[.]

"[Bennett]: That's what I told him, they kept saying, I said not that I know of, and shit if he did he wouldn't be in my car. You know what I'm saying.

"[Bennett]: [Laughter]

"[Smith]: If I knew * * * had a gun, so you know what I mean saying I ain't know no gun dude had no gun.

"[Bennett]: Me either that what I told them.

"[Smith]: * * * [Laughter] So I'm like uh what I say, I say man let me tell you something this ain[']t no fuck'n TV shit bro.

"[Bennett]: That's what I kept telling him man.

"[Smith]: I said let me tell you something man.

"[Bennett]: And see the one cop got

"[Smith]: * * * talked to you three, four days man if you keep trying to shoot them mother fuckers uh TV shit to me man. Cause you saying [Bennett] say. I say man anything [Bennett] said nigga basically well I'm agree with[.]

"[Bennett]: Mmm.

"[Smith]: If [Bennett] said I call, he call me and I said dude shot him in the back. I said didn't you know like that I said didn't you say that. He said na I said you playing games."

## II

### DISCUSSION

A. *Background*

"All murder . . . which is committed in the perpetration of, or attempt to perpetrate, . . . robbery . . . is murder of the first degree." (§ 189.) The mental state required is simply the specific intent to commit the underlying felony, since only those felonies that are inherently dangerous to life or pose a significant prospect of violence are enumerated in the statute. (*People v. Roberts* (1992) 2 Cal.4th 271, 316-317 ["[T]he consequences of the evil act are so natural or probable that liability is established as a matter of policy"].) "Once a person has embarked upon a course of conduct for one of the enumerated felonious purposes, he comes directly within a clear legislative warning — if a death results from his commission of that felony it will be first degree murder, regardless of the circumstances. [Citation.]" (*People v. Cavitt* (2004) 33 Cal.4th 187, 197.)

"[A] conviction for first degree murder is generally punishable by 'imprisonment in the state prison for a term of 25 years to life.' [Citation.] Only if at least one special circumstance allegation is found to be true may a punishment of either death or life in prison without the possibility of parole be imposed. [Citation.]" (*People v. Homick* (2012) 55 Cal.4th 816, 907.)

Section 190.2 lists the special circumstances that, if found true, qualify a defendant convicted of murder for life imprisonment without the possibility of parole or the death penalty. Thus, "every person, not the actual killer, who, *with reckless indifference to human life and as a major participant*, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of a felony enumerated in paragraph (17) of subdivision (a) which results in the death of some person or persons, and who is found guilty of murder in the first degree therefor, shall be punished by death or imprisonment in the state prison for life without the possibility of parole if a special

8

circumstance enumerated in paragraph (17) of subdivision (a) has been found to be true under Section 190.4." (§ 190.2, subd. (d), italics added.) Robbery is one of the felonies listed in paragraph (17) of subdivision (a). (See § 190.2, subd. (a)(17)(A).)

Bennett argues his sentence of life without the possibility of parole must be vacated under *Banks* and *Clark* because he was neither a major participant in the crime nor did his actions reflect a reckless indifference to human life. The Attorney General argues that even after *Banks* there was sufficient evidence Bennett was a major participant and acted with reckless indifference to human life.

B. *The Enmund-Tison Continuum*

Two United States Supreme Court decisions, *Enmund, supra*, 458 U.S. 782 and *Tison, supra*, 481 U.S. 137, illuminate the constitutional limits for punishing accomplices to felony murder. (*Banks, supra*, 61 Cal.4th at p. 806.) The defendants' conduct in those cases stand at opposite ends of a continuum, a spectrum of culpability for felony-murder participants. (*Id.* at pp. 800, 802, 811.) At one end of the *Enmund-Tison* continuum is "'the minor actor in an armed robbery, not on the scene, who neither intended to kill nor was found to have had any culpable mental state.' [Citation.]" (*Banks, supra*, 61 Cal.4th at p. 800.) At the other end are the "actual killers and those who attempted or intended to kill. [Citation.]" (*Ibid.*) "Somewhere between them, at conduct less egregious than the Tisons' but more culpable than . . . Enmund's lies, the constitutional minimum" showing required for the imposition of death or life without the possibility of parole. (*Id.* at p. 802.)

The *Banks* court summarized the conduct of the defendant in *Enmund* as follows: "Earl Enmund purchased a calf from victim Thomas Kersey and in the process learned Kersey was in the habit of carrying large sums of cash on his person. A few weeks later, Enmund drove two armed confederates to Kersey's house and waited nearby while they entered. When Kersey's wife appeared with a gun, the confederates shot and killed both Kerseys. Enmund thereafter drove his confederates away from the scene and

9

helped dispose of the murder weapons, which were never found. He was convicted of robbery and first degree murder and sentenced to death. [Citations.]" (*Banks, supra*, 61 Cal.4th at p. 799.)[3]

The *Banks* court explained that in *Enmund* the United States Supreme Court "found a broad consensus against imposing death in cases 'where the defendant did not commit the homicide, was not present when the killing took place, and did not participate in a plot or scheme to murder.' [Citation.] Accordingly, it held the Eighth Amendment bars the death penalty for any felony-murder aider and abettor 'who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed.' [Citation.] The intent to commit an armed robbery is insufficient; absent the further 'intention of participating in or facilitating a murder' [citation], a defendant who acts as 'the person in the car by the side of the road at the time of the killings, waiting to help the robbers escape' [citation], cannot constitutionally be sentenced to death." (*Banks, supra*, 61 Cal.4th at p. 799.)

At the other extreme, our Supreme Court summarized the conduct of the defendants in *Tison* as follows: "Prisoner Gary Tison's sons Ricky, Raymond, and Donald Tison conducted an armed breakout of Gary and his cellmate from prison, holding guards and visitors at gunpoint. During the subsequent escape, their car, already down to its spare tire, suffered another flat, so the five men agreed to flag down a passing motorist in order to steal a replacement car. Raymond waved down a family of four; the others then emerged from hiding and captured the family at gunpoint. Raymond and Donald drove the family into the desert in the Tisons' original car with the others following. Ricky and the cellmate removed the family's possessions from their car and transferred the Tison gang's possessions to it; Gary and his cellmate then killed all four

---

[3]     The high court framed the question as "whether death is a valid penalty under the Eighth and Fourteenth Amendments for one who neither took life, attempted to take life, nor intended to take life." (*Enmund, supra,* 458 U.S. at p. 787, fn. omitted.)

family members. When the Tisons were later apprehended at a roadblock, Donald was killed and Gary escaped into the desert, only to die of exposure. [Citation.] Ricky and Raymond Tison and the cellmate were tried and sentenced to death. The trial court made findings that Ricky and Raymond's role in the series of crimes was "'very substantial'" and they could have foreseen their actions would "'create a grave risk of . . . death.'" [Citation.] . . . ." (*Banks, supra*, 61 Cal.4th at pp. 799-800.)

The court explained that in *Tison*, "[t]he United States Supreme Court granted Ricky's and Raymond's petitions to consider the application of *Enmund* to these facts. The court began by discussing at length and endorsing *Enmund*'s holding that the Eighth Amendment limits the ability of states to impose death for 'felony murder *simpliciter*.' [Citation.] Specifically, *Tison* described the range of felony-murder participants as a spectrum. At one extreme were people like 'Enmund himself: the minor actor in an armed robbery, not on the scene, who neither intended to kill nor was found to have had any culpable mental state.' [Citation.] At the other extreme were actual killers and those who attempted or intended to kill. [Citation.] Under *Enmund*, *Tison* held, death was disproportional and impermissible for those at the former pole, but permissible for those at the latter. [Citation.] The Supreme Court then addressed the gray area in between, the proportionality of capital punishment for felony-murder participants who, like the two surviving Tison brothers, fell 'into neither of these neat categories.' [Citation.] Here, the court announced, 'major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement.' [Citation.]" (*Banks, supra*, 61 Cal.4th at p. 800.) Therefore, the culpability of nonkiller felony murderers falls on a continuum, and only knowingly creating a "'grave risk of death'" satisfies the constitutional minimum for death penalty

11

eligibility and felony-murder special circumstances. (*Id.* at p. 811; *Tison, supra*, 481 U.S. at p. 157.) [4]

In *Banks,* Banks, Gardiner, and Daniels attempted to rob a medical marijuana dispensary. During the course of the attempted robbery, shots were fired and the three fled. When a security guard attempted to stop them, Banks shot him twice, killing him. (*Banks, supra*, 61 Cal.4th at p. 795.) Matthews served as the getaway driver, dropping the other three off near the dispensary, waiting for them, then picking up Gardiner and Daniels after the failed robbery and driving them away. (*Id.* at p. 805.)

The court found Matthews was not a major participant in the robbery. There was no evidence "establishing Matthew's role, if any, in planning the robbery" or "procuring weapons." (*Banks, supra*, 61 Cal.4th at p. 805) There was no evidence he, Gardiner, or Daniels "had themselves previously committed murder, attempted murder, or any other violent crime." (*Ibid.*) Matthews was not present when the shooting took place, and no evidence showed he instigated or could have prevented the shooting. "On this record, Matthews was, in short, no more than a getaway driver, guilty like . . . Enmund of 'felony murder *simpliciter*.'" (*Ibid.*, quoting *Tison, supra*, 481 U.S. at p. 147.)

The *Banks* court further found Matthews did not act with reckless indifference to human life, noting that while Matthews knew he was participating in an armed robbery, there was no evidence he "knew his own actions would involve a grave

---

[4]    "When the *Banks* court considered the 'spectrum of culpability' described in *Enmund* and *Tison*, it maintained those cases did not represent either a ceiling or floor for determining when an aider and abettor felony-murder defendant was eligible for capital punishment or life imprisonment without parole. [Citation.] Thus, the fact a particular defendant may appear more culpable than Enmund does not automatically make him death eligible. [Citation.] Nor must a defendant be as culpable as Raymond or Ricky Tison for section 190.2, subdivision (d) to apply. [Citation.] The question is one of degree . . . ." (*In re Miller* (2017) 14 Cal.App.5th 960, 974, fn. 4.)

12

risk of death. There was no evidence Matthews intended to kill or, unlike the Tisons, knowingly conspired with accomplices known to have killed before. Instead, as in *Enmund*, Banks's killing of [the security guard] was apparently a spontaneous response to armed resistance from the victim." (*Banks, supra*, 61 Cal.4th at p. 807.)

In *Clark* the court expanded upon its discussion of major participant and reckless indifference to human life. *Clark* involved the attempted robbery of an Orange County computer store. Clark "was the mastermind who planned and organized the attempted robbery and who was orchestrating the events at the scene of the crime." (*Clark, supra*, 63 Cal.4th at p. 612.) During the robbery, one of Clark's accomplices, Nokkuwa Ervin, shot and killed the mother of a store employee who arrived at the store to pick up her son. At the time of the shooting, Clark was not at the store, but he drove to the location shortly thereafter and fled when he saw a woman lying on the ground, the police approaching, and Ervin fleeing the scene.

Clark was convicted of first degree felony murder. In addition, true findings were made on the robbery-murder and burglary-murder special-circumstance allegations, based upon his aiding and abetting liability in the computer store shooting. (*Clark, supra,* 63 Cal.4th at p. 610.) "There was no evidence presented from which the jury could find that [Clark] intended to kill [the employee's mother]." (*Id*. at pp. 610-611.)

To decide whether Clark was a major participant in the robbery, the court reviewed the factors previously discussed in *Banks*. The court had no trouble finding Clark "had a prominent, if not the most prominent, role in planning the criminal enterprise that led to the death of [the mother of the employee]." (*Clark, supra*, 63 Cal.4th at p. 613.) With respect to the use of weapons, the court found there was no evidence Clark supplied the weapon that killed the victim, although it was reasonable to infer he knew a weapon was to be used. (*Ibid*.) "No evidence was presented about [Clark's] awareness of the particular dangers posed by the crime, beyond his concern to

13

schedule the robbery after the store's closing time.  No evidence was presented about his awareness of the past experience or conduct of . . . the shooter.  [Clark] was in the area during the robbery, orchestrating the second wave of the burglary after [the shooter] secured the store, but [Clark] was not in the immediate area where [the shooter] shot [the victim]."  (*Id.* at pp. 613-614.)

Of particular significance to the case before us, after reviewing the *Banks* factors, the court turned to the question of "the amount of culpability that should be assessed for a planner of a felony leading to a murder who is not present during the immediate circumstances leading to the murder."  (*Clark, supra*, 63 Cal.4th at p. 614.)  Ultimately, however, the court did not decide whether Clark was a major participant in the crime because the evidence was insufficient to support a finding Clark acted with reckless indifference to human life.  (*Ibid.*)

Nonetheless, it is significant to note there is significant overlap "between the two elements, being a major participant, and having reckless indifference to human life, . . . 'for the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life.' [Citation.]" (*Clark, supra*, 63 Cal.4th at pp. 614-615.)  "The high court [in *Tison*] also stated: 'Although we state these two requirements separately, they often overlap.  For example, we do not doubt that there are some felonies as to which one could properly conclude that any major participant necessarily exhibits reckless indifference to the value of human life.  Moreover, even in cases where the fact that the defendant was a major participant in a felony did not suffice to establish reckless indifference, that fact would still often provide significant support for such a finding.' [Citation.]  In *Banks*, we observed that *Tison* did not specify 'those few felonies for which any major participation would "necessarily exhibit[] reckless indifference to the value of human life."' [Citation.]  We surmised a possible example would be 'the manufacture and planting of a live bomb.' [Citation.]

14

Yet we also concluded that armed robbery, by itself, did not qualify. [Citation.]"  (*Clark, supra*, 63 Cal.4th at p. 615.)

Thus, "while the fact that a robbery involves a gun is a factor beyond the bare statutory requirements for first degree robbery felony murder, this mere fact, on its own and with nothing more presented, is not sufficient to support a finding of reckless indifference to human life for the felony-murder aider and abettor special circumstance." (*Clark, supra*, 63 Cal.4th at p. 617, fn. omitted.)  "A robbery in which the only factor supporting reckless indifference to human life is the fact of the use of a gun is . . . 'a garden-variety armed robbery. . . .'"  (*Id.* at p. 617, fn. 74, quoting *Banks, supra*, 61 Cal.4th at p. 802.)  "'The Supreme Court thus made clear felony murderers like Enmund, who simply had awareness their confederates were armed and armed robberies carried a risk of death, lack the requisite reckless indifference to human life.'"  (*Clark, supra*, 63 Cal4th at p. 618, quoting *Banks, supra,* 61 Cal.4th at p. 809.)

Analyzing whether Clark acted with reckless indifference to human life, the court again pointed to the *Banks* factors, reiterating that no single factor was necessary or sufficient.  (*Clark, supra*, 63 Cal.4th at pp. 618-623.)  In that light, the court noted that while Clark was present at the scene of the computer store robbery, he did not carry the weapon that killed the victim.  (*Id.* at p. 618.)  Clark was in a car across the parking lot when the shooting took place, and there was no evidence he instructed the shooter to use lethal force or had the opportunity to prevent the shooting.  (*Id.* at pp. 619-620.)

As to the duration of the interaction between the perpetrators and the victim, the court noted "[w]here a victim is held at gunpoint, kidnapped, or otherwise restrained in the presence of perpetrators for prolonged periods, 'there is a greater window of opportunity for violence' [citation], possibly culminating in murder."  (*Clark, supra*, 63 Cal.4th at p. 620.)  The robbery was planned for a time when the store was closed, with only a few employees present.  Nonetheless, the robbers planned to detain those employees in a bathroom while they loaded items onto a truck.  "Because the

15

robbery was planned for a public space and involved the prolonged detention of employees, the crime did involve the risk of interlopers, such as [the victim], happening upon the scene. But overall, [the court concluded] the evidence was insufficient to show that the duration of the felony under these circumstances supported the conclusion that [Clark] exhibited reckless indifference to human life." (*Id.* at pp. 620-621.)

As to whether Clark was aware of the likelihood of a killing, the court pointed out that in *Tison*, "the Tison brothers brought an arsenal of lethal weapons into the prison which they then handed over to two convicted murders, one of whom the brothers knew had killed a prison guard in the course of a previous escape attempt. [Citation.]" (*Clark, supra*, 63 Cal.4th at p. 621.) Additionally, "the Tison brothers had advance notice of the possibility that their father would shoot the [victims] because, in response to one of the victim's plea not to be killed, the father stated that he 'was "thinking about it."' [Citation.]" (*Ibid.*) In *Clark*, however, there was no evidence the shooter "was known to have a propensity for violence, let alone evidence indicating that [Clark] was aware of such a propensity. Because [Clark] was across the parking lot while [the shooter] carried out the first phase of the robbery, [Clark] had no opportunity to observe anything in [the shooter's] actions just before the shooting that would have indicated that [he] was likely to engage in lethal violence. This factor thus does not increase [Clark's] culpability." (*Ibid.*; see also *Banks, supra*, 61 Cal.4th at p. 803, fn. 5 ["[i]n cases where lethal force is not part of the agreed-upon plan, absence from the scene may significantly diminish culpability for death"].)

Finally, in looking at Clark's efforts to minimize the risks of violence during the crime, the court found that although he "was the principal planner and instigator of the robbery," his "apparent efforts to minimize the risk of violence can be relevant to the reckless indifference to human life analysis." In this regard, the court noted in Clark's favor that he planned the robbery for a time when the store was closed, when most of the employees would be gone, and the gun to be used was supposed to be

16

unloaded, although it did, in fact, have one bullet in it. (*Clark, supra*, 63 Cal.4th at pp. 621-622.)

"[A]fter considering those aspects of the present felony that provide insight into both the magnitude of the objective risk of lethal violence and a defendant's subjective awareness of that risk, we conclude that there is insufficient evidence to support the inference that [Clark] was recklessly indifferent to human life. [Clark's] culpability for [the victim's] murder resides in his role as planner and organizer, or as the one who set the crime in motion, rather than in his actions on the ground in the immediate events leading up to her murder. But also relevant to his culpability as planner, there is evidence that [Clark] planned the crime with an eye to minimizing the possibilities for violence. Such a factor does not, in itself, necessarily preclude a finding of reckless indifference to human life. But here there appears to be nothing in the plan that one can point to that elevated the risk to human life beyond those risks inherent in any armed robbery. Given [Clark's] apparent efforts to minimize violence and the relative paucity of other evidence to support a finding of reckless indifference to human life, we conclude that insufficient evidence supports the robbery-murder and burglary-murder special circumstance findings. . . ." (*Clark, supra*, 63 Cal.4th at p. 623.)

C. *Bennett's Habeas Corpus Claim*

We now turn to applying the principles set forth in *Banks, Clark, Enmund,* and *Tison* to Bennett's claim on habeas corpus review.[5] When a defendant seeks habeas corpus relief, the underlying judgment is presumed valid. (*In re Bacigalupo* (2012) 55 Cal.4th 312, 332; *In re Clark* (1993) 5 Cal.4th 750, 764.) In a habeas corpus challenge to the sufficiency of the evidence to support a special circumstance finding, the

---

[5]     The standards articulated in *Banks*, although originally developed in death penalty cases, are equally applicable in cases like Bennett's involving statutory eligibility under section 190.2, subd. (d), for life imprisonment without parole. (*Banks, supra,* 61 Cal.4th at p. 804.)

"standard of review . . . is whether, when evidence that is reasonable, credible, and of solid value is viewed 'in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the allegation beyond a reasonable doubt.' [Citations.] The standard is the same under the state and federal due process clauses. [Citation.] We presume, in support of the judgment, the existence of every fact the trier of fact could reasonably deduce from the evidence, whether direct or circumstantial. [Citation.]" (*Clark, supra*, 63 Cal.4th at p. 610; see *In re Loza* (2017) 10 Cal.App.5th 38, 46 (*Loza*).)

### 1. *Major Participant*

In our original 2010 opinion, we defined "major participant" as "one of the 'more important' members of the group," and cited our decision in *People v. Smith* (2005) 135 Cal.App.4th 914, 928 (*Smith*), overruled on another ground as recognized in *People v. Garcia* (2008) 168 Cal.App.4th 261, 291-292. *Smith* in turn had relied on *People v. Proby* (1998) 60 Cal.App.4th 922 (*Proby*), where the court found "the phrase 'major participant' is commonly understood and is not used in a technical sense peculiar to the law. The common meaning of 'major' includes 'notable or conspicuous in effect or scope' and 'one of the larger or more important members or units of a kind or group.' [Citation.]" (*Id.* at pp. 933-934.) The *Banks* court agreed with *Proby*'s premise, but found it necessary to examine the term more closely in light of *Tison* and *Enmund*. (*Banks, supra,* 61 Cal.4th at pp. 800-801.)

Therefore, after *Banks*, in deciding whether a defendant was a major participant in a special circumstance felony murder, we must consider the following factors: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to

18

facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used? No one of these considerations is necessary, nor is any one of them necessarily sufficient." (*Banks, supra*, 61 Cal.4th at p. 803, fn. omitted; accord *Clark, supra*, 63 Cal.4th at p. 611.)[6]

The evidence certainly supports the finding that Bennett participated in planning the robbery. His preexisting knowledge and relationship with victim Gray were crucial to carrying it out. Although the evidence does not show that Bennett was the sole "mastermind" who single-handedly planned the robbery, it does show that he was instrumental in setting up the plan and carrying it out. Bennett used his prior connections with Gray to arrange and set up what turned into the fatal encounter. Similarly, only

---

[6] See also the current CALCRIM No. 703, revised after *Banks*, which provides in pertinent part:

"A person acts with reckless indifference to human life when he or she knowingly engages in criminal activity that he or she knows involves a grave risk of death.] . . . [¶] . . . [¶] . . .

"When you decide whether the defendant was a major participant, consider all the evidence. Among the factors you may consider are:

"1. What role did the defendant play in planning the criminal enterprise that led to the death[s]?

"2. What role did the defendant play in supplying or using lethal weapons?

"3. What awareness did the defendant have of particular dangers posed by the nature of the crime, any weapons used, or past experience or conduct of the other participant[s]?

"4. Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder?

"5. Did the defendant's own actions or inactions play a particular role in the death?

"6. What did the defendant do after lethal force was used?

" 7. <insert any other relevant factors.>

"No one of these factors is necessary, nor is any one of them necessarily enough, to determine whether the defendant was a major participant."

Bennett's jury was instructed with a prior version of CALCRIM No. 703 that did not define either major participant or reckless indifference to human life.

19

Bennett knew how to contact and locate Gray. Bennett drove the entire group from Oceanside to Irvine, and directed the shooters to Gray's apartment complex. Moreover, it was Bennett's telephone call to Gray that lured him from his apartment and out to where the shooters confronted and ultimately killed him.

Although there was no evidence indicating Bennett supplied the guns used in the robbery, it is not unreasonable to infer he knew about them. Although the evidence on this point is conflicting, there was evidence—namely, the tape-recorded conversation between Bennett and Smith in the back of the patrol car—that reasonably supports a finding Bennett was aware Smith and Brandon Turner were armed prior to the robbery. Accepting this inference, as we must under a substantial evidence standard of review, Bennett knew his cohorts were armed.

There is no evidence to indicate Bennett was aware of the violent nature, if any, of Brandon Turner or Smith. Bennett was near the crime scene and it is reasonable to infer he was crossing the street to join the group when Turner and Smith came running back. There is no evidence to indicate Bennett did anything to mitigate the possibility of violence, although he was present quite near the scene of the shooting. Finally, he fled with the others after Gray had been mortally wounded and robbed, and helped the group make their escape back to Oceanside.

To complete the analysis of Bennett's culpability, we return to the facts of *Enmund* and find Bennett's involvement to be closer to Enmund's than to the Tison brothers. Enmund knew his targeted robbery victim was in the habit of carrying large sums of cash on his person, and enlisted accomplices to go to his house and rob him. Bennett knew Gray to be a reliable drug dealer who always had drugs available on short notice.

Enmund drove his two armed confederates to the victims' house and waited nearby while they entered. Bennett drove the group to Irvine from Oceanside and waited across the street while Turner and Smith went to meet Gray. While Bennett may have

20

been aware his confederates were armed, there is no evidence the robbery was predicated on shooting Gray.

Enmund's victims were killed when the robbery plan went awry, but no evidence showed killing was ever part of the original plan. Bennett's plan fell apart when Gray started running instead of complying, and his cohorts chased Gray down and killed him to complete the robbery. But there was no evidence killing was ever part of the plan. Indeed, Bennett's statements to police after the crime show it was the farthest thing from his mind. After the killings, Enmund drove his cohorts away from the scene just as did Bennett.

In overturning a death sentence for Enmund, the United States Supreme Court "found a broad consensus against imposing death in cases 'where the defendant did not commit the homicide, was not present when the killing took place, and did not participate in a plot or scheme to murder.' [Citation.] Accordingly, it held the Eighth Amendment bars the death penalty for any felony-murder aider and abettor 'who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed.' [Citation.] The intent to commit an armed robbery is insufficient; absent the further 'intention of participating in or facilitating a murder' [citation], a defendant who acts as 'the person in the car by the side of the road at the time of the killings, waiting to help the robbers escape' [citation], cannot constitutionally be sentenced to death." (*Banks, supra*, 61 Cal.4th at p. 799.)

To satisfy section 190.2, subdivision (d)'s, conduct requirement of major participation, the defendant's "personal involvement must be substantial, greater than the actions of an ordinary aider and abettor to an ordinary felony murder such as Earl Enmund." (*Banks, supra,* 61 Cal.4th at p. 802.) We conclude Bennett's culpability in this robbery-turned-murder to be similar to Enmund's.

21

2. *Reckless Indifference*

"'[R]eckless indifference to human life' is commonly understood to mean that the defendant was subjectively aware that his or her participation in the felony involved a grave risk of death." (*People v. Estrada* (1995) 11 Cal.4th 568, 577.) Thus, "the culpable mental state of 'reckless indifference to life' is one in which the defendant 'knowingly engag[es] in criminal activities known to carry a grave risk of death' [citation]. . . ." (*Ibid.*)

"The defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create." (*Banks, supra*, 61 Cal.4th at p. 801.) "[I]t encompasses a willingness to kill (or to assist in another killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Clark, supra*, 63 Cal.4th at pp. 616-617.)

"The Model Penal Code generally defines acting recklessly as follows: 'A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.'" (*Clark, supra*, 63 Cal.4th at p. 617, quoting Model Pen. Code, § 2.02, subd. (2)(c).)

"This definition encompasses both subjective and objective elements. The subjective element is the defendant's conscious disregard of risks known to him or her. But recklessness is not determined merely by reference to a defendant's subjective feeling that he or she is engaging in risky activities. Rather, recklessness is also determined by an objective standard, namely what 'a law-abiding person would observe in the actor's situation.'" (*Clark, supra*, 63 Cal.4th at p. 617.) "[U]nder the Model Penal

22

Code definition, although the presence of some degree of defendant's subjective awareness of taking a risk is required, it is the jury's objective determination that ultimately determines recklessness." (*Id.* at p. 622.)

As we observed above, there is significant overlap between being a major participant and having a reckless indifference to human life. (*Clark, supra*, 63 Cal.4th at pp. 614-615.) Thus, in *Banks*, the Supreme Court instructed that in assessing whether a defendant participated in "'criminal activities known to carry a grave risk of death,'" one or more factors may be considered and weighed, most of which are also applicable in determining whether a defendant was a major participant: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Banks, supra*, 61 Cal.4th at p. 803 [discussing *Tison*].)

Similarly, "[t]o focus the analysis that must be undertaken to decide the sufficiency of proof of reckless indifference, the *Clark* court highlighted a number of factors that warrant consideration: the defendant's knowledge of weapons, and the use and number of weapons; the defendant's proximity to the crime and opportunity to stop the killing or aid the victim; the duration of the offense conduct, that is, 'whether a murder came at the end of a prolonged period of restraint of the victims by defendant'; the defendant's awareness his or her confederate was likely to kill; and the defendant's efforts to minimize the possibility of violence during the crime." (*In re Miller, supra,* 14 Cal.App.5th at p. 973, citing *Clark, supra,* 63 Cal.4th at pp. 618-623.) As with the factors identified in *Banks* determining major participant status, no single factor for

23

determining reckless indifference "'is necessary, nor is any one of them necessarily sufficient.' [Citation.]" (*Clark, supra*, 63 Cal.4th at p. 618.)

In considering the import of *Enmund* and *Tison*, *Banks* observed that capital-eligible felony-murder cases require an individualized assessment of "the defendant's *personal* role in the crimes leading to the victim's death and . . . the defendant's individual responsibility for the loss of life, not just his or her vicarious responsibility for the underlying crime." (*Banks, supra*, 61 Cal.4th at p. 801.)[7] To satisfy the reckless indifference mental state required by section 190.2, subdivision (d), the defendant must have ""knowingly engag[ed] in criminal activities known to carry a grave risk of death."' [Citations.] The defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create." (*Ibid.*; see *In re Miller, supra*, 14 Cal.App.5th at pp. 966-967 [defendant was not present at scene of crime and there was no evidence he knew lethal force was appreciably more likely than that inherent in a "'garden-variety armed robbery,' where death might be possible but not probable"]; compare *Loza, supra,* 10 Cal.App.5th at p. 50 [even if defendant believed killer was joking when he said he had shot someone in the head prior to defendant arming him to commit robbery, the killer's statement "at the very least revealed that [the defendant] with eyes wide open embarked upon an armed robbery with the type of cohort who callously bragged about having shot another human being moments earlier"].)

Like defendant Matthews in *Banks*, here Bennett "did not see the shooting happen, did not have reason to know it was going to happen, and could not do anything to stop the shooting or render assistance." (*Banks, supra*, 61 Cal.4th at p. 807.) He was not "aware of and willingly involved in the violent manner in which the particular offense

---

7    A person who participates in the enumerated crimes in the felony-murder statute (such as robbery) is not automatically deemed to have exhibited reckless indifference to human life. (*Banks, supra*, at p. 810; cf. *Tison, supra*, 481 U.S. at p. 158, fn. 12.)

[was] committed. . . ." (*Id.* at p. 801 & p. 803, fn. 5 [noting *Tison*'s emphasis on defendants' "physical presence and active involvement in every step"].)

"Proximity to the murder and the events leading up to it may be particularly significant where . . . the murder is a culmination or a foreseeable result of several intermediate steps, or where the participant who personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force. In such cases, 'the defendant's presence allows him to observe his cohorts so that it is fair to conclude that he shared in their actions and mental state . . . . [Moreover,] the defendant's presence gives him an opportunity to act as a restraining influence on murderous cohorts. If the defendant fails to act as a restraining influence, then the defendant is arguably more at fault for the resulting murders.'" (*Clark, supra*, 63 Cal.4th at p. 619.) Here, Bennett was across the street from Gray's apartment complex. There is no evidence of a plan to shoot Gray, or of Turner's or Smith's propensity to do so, and Bennett was never in close enough proximity to act as a restraining influence.

*Clark* also found a salient factor in the duration of the interaction between the perpetrators and the victim, noting that "[w]here a victim is held at gunpoint, kidnapped, or otherwise restrained in the presence of perpetrators for prolonged periods, 'there is a greater window of opportunity for violence' [citation], possibly culminating in murder." (*Clark, supra,* 63 Cal.4th at p. 620.) "Courts have looked to whether a murder came at the end of a prolonged period of restraint of the victims by [the] defendant. The Tisons, the high court noted, 'guarded the victims at gun point while [the group of perpetrators] considered what next to do.' [Citation.]" (*Ibid.*, fn. omitted.) Here, there was nothing presented that the duration of the robbery presented heightened risks or exhibited reckless indifference to human life beyond that associated with the crime itself.

25

The time lapse between Turner and Smith leaving Bennett in the parking lot and their return was minutes,[8] rendering this aspect negligible.

The Attorney General argues Bennett acted with reckless indifference by failing to help Gray and instead helping his confederates escape the scene. True, Bennett enabled the shooters' escape, and left Gray to his unfortunate fate. (See *People v. Medina* (2016) 245 Cal.App.4th 778, 792 ["He helped [his cohort] escape and had no concern for the shooting victim."]; *People v. Bustos* (1994) 23 Cal.App.4th 1747, 1754 ["[The defendant] fled together with his accomplices and the robbery loot, leaving the victim to die."].)

Nonetheless, *Medina* is readily distinguishable. In *Medina*, the killer was a drug dealer who shot a supplier who had "shorted" him. Medina had alerted the killer to the shortage of drugs, accompanied him to the scene, participated in the attempted armed robbery, and "made no attempt to intervene or avert the violence that followed." (*Medina, supra,* 245 Cal.App.4th at p. 791.) Moreover, Medina previously had assisted the killer in another shooting, and knew the killer was willing to resort to deadly violence. (*Id.* at p. 792.) Similarly, *Bustos*, a pre-*Banks* case, is inapt because there the defendant was himself physically struggling with the robbery victim when his cohort, known by defendant to be outside and armed with a knife for "protection," came in and stabbed the victim to death.

In *Proby, supra,* 60 Cal.App.4th 922, a case we cited in our 2010 unpublished opinion, the court found a felony-murder special circumstance supported by evidence that Proby, who was not the actual killer, had participated in a prior robbery in which his codefendant Vines, locked the employees of a fast-food restaurant in the walk-in freezer with the expectation they would be trapped in the freezer for at least five hours. Moreover, Proby provided Vines with a gun and was himself armed with a gun. Proby

---

[8] After Bennett's call, Gray left his apartment at about 11:00 p.m.; police arrived at 11:34 p.m.

26

saw the wounded victim but did not attempt to assist him or determine whether he was still alive. After the shooting, Proby and Vines took money from the safe. Finally, Proby knew that Vines had worked at the second restaurant they robbed, which increased the likelihood that Vines would be recognized and resort to violence to avoid capture. (*Id.* at p. 929.) Bennett's case is quite different.

Unlike *Proby,* here no evidence showed Bennett knew either Smith or Brandon Turner had any history of violence or violent propensities, or presented any risk they would shoot or behave violently toward Gray during the planned robbery. No evidence showed that shooting Gray was part of the plan to rob him. Thus, even though Turner stated a desire to commit a robbery (he "needed 'a lick.'"), there is no evidence he ever informed the group he was willing to use a gun to obtain the drugs, or that Bennett knew Turner had ever committed a prior violent crime. "A defendant's knowledge of factors bearing on a cohort's likelihood of killing [is] significant to the analysis of reckless indifference to human life." (*Clark, supra*, 63 Cal.4th at p. 621.) No evidence was presented that Turner or Smith were "known to have a propensity for violence, let alone evidence indicating that [Bennett] was aware of such a propensity." (*Ibid*.) There was also no evidence presented that Bennett observed anything before the events leading up to the robbery that would have indicated his other codefendants were likely to engage in lethal violence. No evidence was presented the codefendants discussed shooting anyone or engaging in violence. In fact, the opposite appears to have been true, as Bennett told police and his friends that the plan was to rob Gray, not shoot him.

The evidence does not suggest Bennett harbored a reckless indifference to human life in implementing and carrying out the robbery plan. While it is reasonable to infer Bennett was aware Turner and Smith were armed, like the defendant in *Clark,* Bennett was across the street in the parking lot when the shooting took place, and there was no evidence he instructed the shooters to use lethal force or had the opportunity to

stop the shooting. (*Clark, supra,* 63 Cal.4th at p. 619 ["In *Tison*, the high court stressed the importance of presence to culpability"].)

Here, like defendants Enmund, Matthews and Clark, Bennett was not present when the shots were fired, nor was he in a position to prevent the actual murder. At the time of the shooting, he was across the street and he did not see or know if anyone was shot or hurt. (See *Banks, supra,* 61 Cal.4th at p. 807 ["Matthews, like Enmund and unlike the Tisons, did not see the shooting happen, did not have reason to know it was going to happen, and could not do anything to stop the shooting or render assistance"].) After the shootings, Bennett fled with the others, but that does not support an inference Bennett necessarily understood a killing had occurred.

Considering the totality of the circumstances, it appears Bennett did not anticipate the potential for loss of human life beyond that which usually accompanies an armed robbery. Our Supreme Court has held that is not reckless enough to support a special circumstance finding. (*Clark, supra,* 63 Cal.4th at pp. 617-618; *Banks, supra,* 61 Cal.4th at p. 802.) Per our high court, reckless indifference must involve more than simply participating in an armed felony; some knowing disregard of the risk to human life is necessary. (*Clark, supra,* 63 Cal.4th at pp. 617-618; *Banks, supra,* 61 Cal.4th at pp. 801-802. Because the evidence underlying Bennett's special circumstance finding does not demonstrate more than that, it cannot stand. Considering the "totality of the circumstances" derived from the evidence presented at Bennett's trial (*Banks, supra,* 61 Cal.4th at p. 802), we conclude the robbery-murder special circumstance finding must be vacated on this ground as well.

Thus, following *Clark,* we conclude "after considering those aspects of the present felony that provide insight into both the magnitude of the objective risk of lethal violence and [Bennett's] subjective awareness of that risk, . . . there is insufficient evidence to support the inference that [Bennett] was recklessly indifferent to human life." (*Clark, supra,* 63 Cal.4th at p. 623.) Even assuming Bennett knew Turner and Smith

28

were armed, his culpability is based mainly on his role as a planner and driver for a robbery, "rather than in his actions on the ground in the immediate events leading up to [the] murder." (*Ibid*.) There was nothing he did, or did not do, "that elevated the risk to human life beyond those risks inherent in any armed robbery." (*Ibid*.) The evidence showed only a "'garden-variety armed robbery'" where death was at most a known possibility, but not a probability. (*Id.* at p. 617, fn. 74.) Apart from setting up the original plan and luring Gray out of his apartment, there is little in this case to distinguish it from the crimes in *Enmund* and *Banks*.

We conclude the evidence is insufficient to support a finding Bennett was a major participant who acted with reckless indifference to human life. On the continuum of aiding and abetting culpability for felony-murder defendants, Bennett "is decidedly closer to Enmund, Matthews, and Clark than he is to the Tison brothers." (*In re Miller, supra*, 14 Cal.App.5th at p. 974.) Bennett's individual culpability does not suffice to support the special circumstance finding. To conclude otherwise under the facts of this case would be to conflate special circumstance murder with the felony-murder rule. (*Clark, supra*, 63 Cal.4th at pp. 616-617, 623; *Banks, supra*, 61 Cal.4th at p. 810.) Bennett was convicted of robbery and first degree murder because he planned and joined in this criminal enterprise with Turner and Smith. But that is where his criminal liability ends.

## III

### DISPOSITION

The petition for habeas corpus is granted. The true finding on the robbery-murder special circumstance allegation under section 190.2, subdivision (a)(17)(A), is vacated. The matter is remanded with directions to resentence Bennett consistent with the views expressed in this opinion.


ARONSON, J.


WE CONCUR:


O'LEARY, P. J.


IKOLA, J.